ALETHA SLINGERLAND v. THOMAS A. GILLESPIE ET AL.

Argued November 6, 1900—Decided February 24, 1902.

In a suit for assault the defendants pleaded that the plaintiff unlaw-
fully interfered with the business of the defendants in a specified
close, and was gently removed in the supposed trespasses.   The
plaintiff replied (1) that she did not unlawfully so interfere with
such business, and (2) that excessive force was used against her.
On the trial of the issues joined in the suit the proof was mainly
addressed to the question of the defendants' right to possession of
the close at the time of the occurrences involved.   The clear
weight of the evidence was in favor of such right and of the
justification pleaded.   There was testimony that incidentally the
plaintiff, while standing outside of the close, which was part of
the right of way of a pipe line for a water-supply, was pressed
against by a section of steel pipe, being rolled into place in the
close, but projecting beyond it, and in front of which, as it was
being rolled, she placed herself.   She was not bruised or hurt by
the contact.   The claim of injury was of chronic neurasthenia
resulting from the nervous excitement of the contest to prevent
the occupation of the close.   *Held*, that a verdict for substantial
damages could not be sustained even if what so occurred outside
the close was technically a trespass.

On defendants' rule to show cause why a new trial should
not be granted and plaintiff's motion to amend her declaration
to increase the claim of damages so as to conform to the
verdict.

The plaintiff declared as in trespass *vi et armis* for the roll-
ing against her person of a steel pipe of great weight, and
the seizing and pulling her about by the servants of the de-
fendants on December 24th, 1891, in the township of Pequan-
nock, in the county of Morris.   She claimed $5,000 as damages.
The defendants pleaded not guilty, and also that, they being
in lawful possession of a described close in said township, the
plaintiff was unlawfully upon the same, and with force and
arms attempted to prevent them from there carrying on their
lawful business, whereupon she was, by their servants, gently
removed in the supposed trespasses sued for.   The plaintiff,
by *similiter,* joined in the general issue, and, to the special

plea, replied, first, that she was not unlawfully on such close of the defendants so attempting to prevent them from there carrying on their lawful business, on which replication issue was joined, and, secondly, that excessive force was used against her, and, on traverse of that replication issue was joined.

The proof established that on the day named, the plaintiff, then about eighteen years old, professing to act for her father, in his absence, passively resisted the entry by Thomas A. Gillespie, one of the defendants, who were subcontractors, with their servants, upon a strip of land thirty-three feet wide condemned across her father's farm in said township for the purpose of a conduit for the water-supply of the city of Newark, constructed under contract between that municipality and the East Jersey Water Company; that notwithstanding information that the entry was under claim of right, and demanding that the defendants should show written authority therefor, the plaintiff obstructed the surveyors of the water company in defining on the ground the lines of the condemned strip, and the workmen then proceeded to make the entry and dig the trench for the pipe line to be laid in it by the aid of marks previously made, and to roll into place the heavy sections of steel pipe four feet in diameter and twenty-seven or eight feet long; that the plaintiff put herself in the way and was removed by the servants of the defendants; that this happened several times, and in the progress of the affair she was, before she could be removed on some of the occasions, pressed against by a section of pipe as it was slowly rolled along. There was testimony that some of the sections projected beyond the condemned strip and that at least on one occasion the plaintiff was so pressed against while standing outside of such strip. No excessive force in removal was proved. The plaintiff was not physically hurt or bruised, the substantial damage asserted being for chronic neurasthenia resulting from the nervous excitement induced by the contest. The right of entry was only perfected by tender to the landowner of the sum awarded him in the condemnation on the very day of the occurrences mentioned, and the chief dispute of fact at the trial was whether the entry preceded or followed such tender.

The plaintiff recovered a verdict of $5,500.

Before DEPUE, CHIEF JUSTICE, and Justices GARRISON, GUMMERE and COLLINS.

For the plaintiff, *Chandler W. Riker.*

For the defendants, *Joseph Coult.*

The opinion of the court was delivered by

COLLINS, J. It incidentally appears in the evidence that the plaintiff had previously sued the East Jersey Water Company for the same alleged cause of action. We find that a verdict recovered in that case of $5,000 was set aside by this court, and as some of the legal questions now involved were then settled, it will be necessary to advert to the opinion read by Chief Justice Beasley on that occasion. *Slingerland v. East Jersey Water Company,* 29 *Vroom* 411.

The state of facts recited was the same as that above given, except that there seems to have been no dispute in that case that the entry was after the tender, for it is stated in the opinion that such entry was "admittedly in all respects legal." It is recited that no other authority for the plaintiff to act for her father was proved than by his declaration in testimony that when he left home in the morning he left his farm in the care of his daughter, who had been in the habit of assisting him in the business there carried on. The law of the case was thus declared: "The plaintiff, in her conduct on this occasion, was a pure and simple wrongdoer. She had no authority from her father to intervene in the affair. She was not his agent for that purpose, and he was not responsible for her acts. But even if she had been specially empowered by him to do what she did, it would have been of no avail, for this subcontractor, having taken possession of the strip of land which had been condemned and paid for, had the right to defend that occupancy even against the landowner himself. Under the circumstances mentioned, if the proprietor of the farm had interposed his person so as to be an obstacle to the laying of the pipes, it is plain that he could have been lawfully pushed aside, by the use of all the force

needful for that end.  The rule of law upon this subject is
not open, in this state, to any question.  Nor will the pretence
set up at the trial, that the plaintiff, on at least one occasion,
was pushed against by one of the water-pipes while she was
standing on her father's land outside of the strip of thirty-
three feet, be of any avail.  The claim was that, in rolling
some of the pipes, they extended on to the contiguous prop-
erty, and one of the plaintiff's witnesses says that at one of the
times in question the plaintiff was at least two feet beyond the
line of the condemned tract.  If this be so, she was still there
committing a trespass, for her purpose and attempt were to
prevent, by force, this contractor from the exercise of his
legal right.  There is no testimony that even tends to show
that she had been commissioned by her father to defend, by
violence or by any other means, an intrusion, no matter how
wrongful, into any part of his lands.  The result is that
the court concludes that the contractor under the defendant
was in lawful possession of the premises in dispute; that he
had the right to use the necessary force to maintain such
occupancy, and that the plaintiff herself was the wrongdoer
in the occurrence forming the basis of the suit."

It was further the opinion of the court that, admitting a
cause of action, the East Jersey Water Company would not
be the party to be implicated, as Gillespie was an independent
contractor to do the work in its behalf, and that, in any view,
the damages awarded were excessive; and on all those grounds
the rule to show cause was made absolute.  The subject of
damages was thus presented: "Lastly, the verdict is so ex-
cessive with respect to damages that it would be necessary to
set it aside even if otherwise unobjectionable.  The sum is
$5,000, and for what mischief done by the defendant is this
amount awarded?  It is said that the plaintiff's nervous sys-
tem was morbidly affected by the occurrences above narrated.
But the question is, how much had the defendant (regarding
Gillespie as its agent) contributed to produce this unfortu-
nate result?  What it had done was this: When the plaintiff
had placed herself before the slowly-rolling pipes, to remove
her from the danger, if any, so incurred.  This was done con-

siderately and kindly, and so far was this from disordering her nerves, that on one occasion she laughed as she was led away. It appears absurd to insist that if the plaintiff received a nervous shock on the occasion in question, it was occasioned by the conduct of the contractor and his assistants. When a girl of eighteen entered upon the extravagant enterprise of placing her body as an obstacle in the way of over fifty laborers in the prosecution of their work, it is plain that she must have been wrought up to the highest point of nervous excitement, and if disease in that line ensued, the cause is obvious. This principal factor in this branch of the case has been obviously overlooked by the jury."

After this decision the present suit was begun and in due course came to trial, the plaintiff recovering a verdict for $2,500, which also was set aside by this court, Mr. Justice Gummere, now sitting, reading the opinion. *Slingerland* v. *Gillespie,* 36 *Vroom* 92. On that trial the authority to the plaintiff, stated by her father in the testimony, was "to look after the property while he was gone, and if anyone entered the premises to ask them to show a written authority for their entry, and in case they did not have authority, to forbid them the premises in his name." The time of entry was disputed and this court was of opinion from testimony not, however, recited, that it was clearly after the tender, but the decision of the cause was rested on a lack of authority in the plaintiff to resist such entry. The case in this regard was held indistinguishable from that against the water company. On the trial now under review the father testified that his instructions went further than he had before stated, and authorized and directed the plaintiff "not to allow anyone to come on the place, but to keep them off unless they showed written authority to do so." It therefore becomes necessary to examine the evidence as to the time of the entry which the plaintiff resisted.

Mr. Slingerland had procured from the Court of Chancery an order temporarily restraining entry on the condemned strip. The water company, in expectation of the removal of the restraint, had notified the subcontractors to be in readiness for

work upon notice to proceed, the conduit having been constructed throughout its entire length, except across the Slingerland farm and a short distance on each side, and Mr. Gillespie had had a force of men at hand for some days. The sections of pipe were on the adjoining lands near the fence lines. The matter was to come up at chambers at ten o'clock in the forenoon of December 24th, and the reason for Mr. Slingerland's absence from home was to attend on that occasion. The undisputed evidence is that the restraint was removed at about a quarter-past ten; that the award of the commissioners was immediately tendered and that shortly afterward word was sent by telephone to Mr. Gillespie to proceed. The contention for the plaintiff is that this order was anticipated by an earlier entry. The entry, whenever made, was from the north. The testimony as to time on the part of the plaintiff was first taken and was as follows:

Jacob A. Slingerland, an uncle of the plaintiff, testified that he drove away from his brother's farm at about half-past eight and that a fence had then been thrown down and the men had begun to dig the trench. There was testimony for the defence that there was digging on the adjoining land in continuation of the pipe already laid there before the entry on the Slingerland strip and the only mistake that need be attributed to this witness to make his testimony consistent with that for the defence is his memory as to any fence being down. He drove to Lincoln Park, three and a half miles and back, stopped at the post-office to get his mail, which came by a train arriving just after ten o'clock, and then went up to his brother's. When he arrived there the workmen were rolling pipes toward the plaintiff and the witness' brother Samuel. The plaintiff seemed exhausted and soon went into the house. It is worth noting that Amzi E. Zelff, a witness called for the plaintiff, who testified to seeing Jacob at Lincoln Park that morning, quotes him as saying only "I think they are going to *try to come* on the land." This witness says that Jacob left Lincoln Park at about ten o'clock, and had to drive three miles. Samuel Slingerland, another uncle, fixes the time of the entry at about eight o'clock, but gives no corroborating

circumstance. He went over when sent for. Jacob had already gone away, and the first man he saw was the surveyor, Olmstead, whose instrument he threw down. Surveying being rendered impossible, the pipes were rolled in without it, and the witness and the plaintiff placed themselves in their way. He fixes Jacob's return at about half an hour after he and the plaintiff had stood in front of the rolling pipes, and as a little after ten o'clock. John H. Beach, who was the man sent for Samuel, could not say at what time the men began to work, but thought at about half-past eight; could not remember at what time he went for Samuel—"somewheres around nine o'clock"—the fence was being torn down; Jacob had gone out with the wagon; it did not take "over twenty minutes, I don't believe," to get back with Samuel. When asked what was then going on, he says: "Well, they were digging—starting to work." George Zeek, a laborer on the Slingerland farm, testified that Jacob went away about eight, and Samuel came about half-past eight; and then in answer to the question: "Well, just tell us what happened after that?" he tells of the plaintiff's meeting Mr. Gillespie—the fence being then torn down—and asking him his authority to come on her father's property, and of Gillespie's saying to her that he had authority only by telephone, and starting the men—fifty, more or less—digging the trench. Later he fixes this conversation at exactly eight o'clock, and says he looked at his watch so as to see what time it was. On rebuttal, the testimony of this witness on the former trials was proved. On the first he said that he carried no watch and could not tell just the time of the occurrences, and on the second, he said he could tell the time because he was in the house just before and saw the time by the kitchen clock. His testimony as to time is valueless except so far as it fixes the entry as being after Mr. Gillespie had received a telephone message communicated to the plaintiff. Sarah R. Slingerland, the mother of the plaintiff, testified that the plaintiff went out when the men were going on the land, but could not fix the time; "when she came back it may have been ten o'clock; cannot precisely say; it was before

dinner." This comprises all the testimony on this subject adduced for the plaintiff. She herself was called as a witness, but became hysterical and was withdrawn. Her testimony was struck out, but was printed in the case. When she left the stand she had not reached a narrative of the occurrences in suit and of course had fixed no time. This uncertain and unreliable testimony is consistent with the alleged assault on the plaintiff being after the tender, whatever it may indicate as to the entry on the land. Against it the defendants bring most persuasive evidence that nothing was done on the Slingerland farm until after the telephone message following the tender. The telephone message was sent to a special station at Gillen's hotel, near the Slingerland place. Archie H. Snow, the man who received it, testified that it came between ten and eleven, and that he communicated it to Mr. Gillespie, who testified that he had been waiting for such a message and that no entry was made until after it came. He fixes the time as between half-past ten and eleven and says that he told the plaintiff of the message when she came to ask his authority for entering on the land. William F. Jones, defendants' foreman, testified that the workmen had been boarding at farmhouses and other places waiting three days for the "injunction to be lifted," and that they commenced to get the pipe on to the Slingerland property at about eleven o'clock, and not until after Mr. Gillespie had said that the injunction was "lifted." He heard Mr. Gillespie tell the plaintiff that he had "got orders by telephone from the court." Adelbert H. Olmstead, the engineer in charge, testified that work on the Slingerland farm began at half-past eleven o'clock in the morning, and that he noted the time in his diary produced in court. Benson F. Snyder, his assistant, testified that he walked from Butler to the Slingerland place, not leaving Butler until a quarter of ten, and reaching Gillen's hotel a little before eleven. When he reached the property the fence had not been taken down. The plaintiff and her uncle Samuel tried to interfere with the sighting of the lines by getting in front of the instrument. He heard Mr. Gillespie tell the plaintiff of the telephone message. Frederick J. Gubelman, the engineer for the pipe manufac-

turers, testified that he left Paterson at about half-past nine and drove to the Slingerland place, arriving there between half-past ten and eleven, and that the plaintiff talked with him while he was hitching his horse; that nothing at all had then been done on the Slingerland property, and the fence was not down; that it was in the neighborhood of half an hour later when Mr. Gillespie came and gave instructions to tear down the fence and begin work, and that he and the witness both told the plaintiff, when asked what authority they had for entering, that they had no other than a telephone message and that she said she wanted written authority. Alexander Gillen, the hotel-keeper, testified that he saw the fence taken down between half-past ten and eleven. Martin P. Voorhees, an old resident of the neighborhood, standing by, testified that the first pipe went in at about eleven o'clock. Patrick J. Lawlor, a boilermaker employed on the work, testified that he left Paterson with a gang of workmen at about a quarter to eight and came by train to Pompton Junction and then walked half a mile to the Slingerland property, reaching there at about half-past nine. As nothing was doing there the men went to the boarding-houses. He thinks that they started to pull down the fence about ten o'clock or a quarter past. Henry M. Daniher, in defendants' employ, testified that he drove out from Newark and reached Gillen's between nine and ten; that no fence was down then; that he waited until he got word that it was all right to go on, and then went for some Italian laborers at a shanty a mile or a mile and a half away; that when he returned the fence was down. This was nearly eleven o'clock, and the first piece of pipe was rolled in fifteen or twenty minutes later. Peter L. Bergen, time-keeper for the defendants, was on the ground at seven o'clock waiting for orders. He testified that the entry was made between ten and eleven o'clock. The variation as to time in the testimony of these witnesses does not reflect on their substantial honesty. On the contrary, it shows that their testimony was not the result of concert between them. The essential and highly probable element inhering in the facts circumstantially detailed is that the entry on the Slingerland farm was not made

until after Mr. Gillespie had received the telephone message, and consequently not until after the tender was made. One circumstance should be mentioned that may throw light on apparent discrepancies as to time. Mr. Slingerland, for precaution, had set up a few panels of fence inside of that presumably on his north line. It is possible that the line fence was displaced by the digging on the adjoining property at a time considerably earlier than the effectual entry on the land. Which fence the respective witnesses on either side had in mind when testifying is not clear, and after nine years it is not strange that memory on such a point should be vague.

The clear weight of the evidence is that the supposed assaults on the plaintiff were after the defendants' right of entry on the condemned strip was complete and after actual possession had been taken. To the extent of any injury resulting from the plaintiff's interference with the prosecution of the work on that strip she is remediless. *Pamph. L.* 1891, *p.* 172; *Slingerland* v. *Newark,* 25 *Vroom* 62, and the two cases already cited. As to incidental contact with a rolling pipe while standing outside of the strip, we are concluded by the deliverance of this court on that subject in the case against the East Jersey Water Company, *ubi supra,* namely, that the plaintiff was nevertheless a trespasser, because her purpose and attempt were to prevent, by force, the exercise of a legal right. If we could consider the question *de novo,* the result would be the same, especially in view of the pleadings in the cause. The defendants, in their plea of justification of the supposed trespasses, set up that they occurred on a specified close. The plaintiff did not newly assign, but, by her first replication, inartificial, because containing a negative pregnant, but capable of no other construction than as referable to the close described by the plea, joined issue merely on the lawfulness of her presence on that close and her conduct there. Her second replication raised no other issue than of excess of force in her removal from that close. The learned justice who tried the cause instructed the jury that if the action of the plaintiff upon the adjoining land was part of a design on her part to prevent the pipes from being put upon the

thirty-three-foot strip, and without intention to protect the land outside of that strip, she could not recover. That instruction must stand as the law of the case on this rule. It is too plain, from the evidence, to admit the upholding of a contrary verdict that the sole purpose of the plaintiff was to prevent the defendants laying the pipe line. She interfered with the surveyors in marking the lines of the strip to such an extent that the jury was rightly instructed that an accidental encroachment through such interference would preclude recovery for a trespass outside of its lines. Such interference makes clear her design, for had she been merely endeavoring to protect the other land of her father, she would have been as much interested as the defendants in learning the boundaries of the respective rights.

If, disregarding, as *obiter,* the former deliverance of this court and ignoring inconsistency of the verdict with the instruction of the trial judge and treating the pleadings as amended so as to present an issue of a trespass committed outside of the land of which the defendants claimed the right of possession, we proceed to consider the amount of damages awarded, we find it so excessive as to compel a new trial. A less sum was thought by this court to be so even if referred to the entire affair; *a fortiori* would it be when referable only to the incidental trespass. The excitement which it is assumed led to the chronic neurasthenia, from which the plaintiff now suffers, was due to her resistance to the defendants' lawful right. The touching of her person by a section of water-pipe when she happened to be outside of the thirty-three-foot strip, if technically a trespass, was not the provoking cause of that condition. There was no wanton or willful injury to warrant punitive damages. The measure properly submitted to the jury was compensation, and that would have been afforded by little more than a nominal award.

In any view of the case the verdict cannot stand, and the rule to show cause will be made absolute.

This result renders unnecessary a decision of the plaintiff's incidental application to amend her declaration by increasing the claim of damage. As an independent motion, it pertains to the Branch Court.